# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HARDWIRE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-54-LPS-CJB |
| | ) | |
| ZERO INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This case arises out of a breach of contract action filed by Plaintiff Hardwire, LLC

("Plaintiff" or "Hardwire") against Defendant Zero International, Inc. ("Defendant" or "Zero") in

the Superior Court of the State of Delaware, in and for New Castle County ("Delaware Superior

Court"). (D.I. 1, ex. A (hereinafter, "Complaint")) Zero removed this case from Delaware

Superior Court pursuant to 28 U.S.C. § 1441. (D.I. 1) Presently pending before the Court is

Zero's motion to dismiss Hardwire's claim pursuant to Federal Rules of Civil Procedure 12(b)(2)

and 12(b)(5) (the "Motion").[1] (D.I. 4) For the reasons that follow, the Court recommends that

Zero's motion be DENIED.

## I. BACKGROUND

### A. Factual Background

#### 1. The Parties

---

[1]     In its briefing, Zero suggested that this action should be dismissed pursuant to
Federal Rule of Civil Procedure 12(b)(3), on the ground that it was filed in an improper venue, in
contravention of the requirements of 28 U.S.C. § 1391. (D.I. 12 at 4-6) At oral argument, the
Court questioned the legal basis for this assertion, in light of the fact that Zero had removed this
case to this Court. (D.I. 20 at 45-50) Zero subsequently confirmed that its Rule 12(b)(3) motion
was not viable and withdrew it. (D.I. 18 at 4) Thus, the Court will not address the issue further
in this Report and Recommendation.

Plaintiff Hardwire is a closely held Delaware limited liability company, with its principal place of business in Pocomoke City, Maryland. (Complaint at ¶ 1) It is in the business of infrastructure reinforcement. (*Id.*)

Defendant Zero is a New York corporation with its principal place of business in the Bronx, New York. (D.I. 1 at ¶ 9; Complaint at ¶ 2) It manufactures, *inter alia*, fire resistant materials that increase in volume when exposed to heat ("intumescent materials"). (Complaint at ¶ 8 & ex. A)

### 2. 2011-2012 Communications Prior to the Submission of the November 6, 2012 Purchase Order (Purchase Order 84310)

Hardwire was hired by a customer to improve fire resistance for a particular piece of the customer's infrastructure (hereinafter, the "Project"). (*Id.* at ¶¶ 5-6) In furtherance of the Project, Hardwire sought to subcontract for materials meeting certain fire resistant specifications. (*Id.* at ¶¶ 7-8)

Hardwire and Zero began their relationship on August 16, 2011, when Hardwire's Vice President, Skip Ebaugh ("Ebaugh") and Zero's President, owner and Chief Executive Officer, Elias Wexler ("Wexler") met at Zero's offices in New York. (D.I. 22, Supplemental Declaration of Elias Wexler (hereinafter "Wexler Supp. Decl."), at ¶¶ 1, 8) The two men discussed whether Zero would be able to supply Hardwire with the type of fireproof materials Hardwire sought for its work on the Project. (*Id.* at ¶ 8)

Thereafter, on multiple occasions in 2011 and 2012, Hardwire ordered and received from Zero small amounts of intumescent materials, for the purposes of research, development and testing. (*Id.* at ¶¶ 10-16 & ex. A; D.I. 23, Declaration of Timothy Robert Keller In Support of

2

Hardwire LLC's Opposition to Zero International, Inc.'s Motion to Dismiss (hereinafter, "Keller Decl."), at ¶ 3) Through discussions between the parties during this time period, it became apparent that Hardwire's needs for the Project would be best met by Zero's FS3003 INTUMET materials. (Wexler Supp. Decl. at ¶ 15)

Thereafter, Wexler and Ebaugh met in person at Zero's New York office on May 12, 2012, and then again on August 23, 2012. (*Id.* at ¶ 17) The purpose of these meetings was to discuss the possibility that Hardwire might make a much larger order of Zero's fireproof materials (as opposed to the smaller purchases that Hardwire had already made for research, development and testing purposes). (*Id.*; Keller Decl. at ¶ 4) Timothy Keller ("Keller"), a Manager in Hardwire's Bridge and Infrastructure Armor department, also attended the August 23, 2012 meeting with Ebaugh on Hardwire's behalf. (Keller Decl. at ¶¶ 1,5)

Three days before that August 23, 2012 meeting, on August 20, 2012, Ebaugh sent Wexler an e-mail setting out Hardwire's agenda for the meeting; the e-mail stated that Hardwire would like "to discuss the upcoming project, material availability, T&C's, etc." (Wexler Supp. Decl. at ¶ 18 & ex. B; Keller Decl. at ¶ 5) According to Keller, the abbreviation "T&C's" referred to Hardwire's "Standard Terms and Conditions for Purchases" (hereinafter "Standard Terms and Conditions")—a document referenced further below that had not been discussed or utilized in the parties' prior dealings. (Wexler Supp. Decl. at ¶¶ 12-16; Keller Decl. at ¶ 5)

The parties have each provided descriptions of what actually occurred during the August 23, 2012 meeting. (Wexler Supp. Decl. at ¶¶ 19-20; Keller Decl. at ¶ 6) In Wexler's supplemental declaration, he states:

> During the August 23, 2012 meeting, Ebaugh and I discussed in

3

even greater detail the terms and conditions of Hardwire's anticipated order, including the particular product they had decided to order for the project (product # FS3003), the precise specifications for the product, the quantity desired, the price per unit, and the manner and method of delivery. Ebaugh confirmed with me at this meeting that Hardwire would require the material to be a non-standard, custom width. I confirmed with Ebaugh that Zero would be able to accommodate this request, but that due to the nature of the custom order, Hardwire would have to purchase custom-sized and custom-assembled bags to accommodate the fireproof materials. . . . Consistent with our prior discussions and Hardwire's prior orders, during my August 23 meeting with Ebaugh, we did not discuss, negotiate or agree to anything concerning the selection of a forum to adjudicate any dispute that might arise between our companies. This was never part of our talks, and it was never proposed or accepted as a term or condition of [Hardwire's] order.

(Wexler Supp. Decl. at ¶¶ 19-20) In his declaration, Keller states:

At the meeting, Mr. Ebaugh and I mentioned Hardwire's terms and conditions to Mr. Wexler. Indeed, Hardwire's Terms and Conditions were specifically mentioned as an agenda item for this meeting in the [August 20, 2012] e-mail . . . . At the meeting, Mr. Ebaugh and I informed Mr. Wexler that Hardwire would be issuing a formal purchase order at the appropriate time in Hardwire's project. In this respect, I dispute the characterization of the August 23rd meeting as set forth in [Wexler Supp. Decl. at ¶ 20]. Although it is true that the attendees at that meeting did not specifically discuss a forum-selection clause, Mr. Ebaugh and I did tell Mr. Wexler that this upcoming large order needed to include Hardwire's Standard Terms and Conditions. Mr. Wexler did not object or voice any concerns regarding Hardwire's Standard Terms and Conditions.

(Keller Decl. at ¶ 6)

After the August 23, 2012 meeting, Ebaugh requested that Wexler provide him with a written price quote; Wexler sent Ebaugh the quote on September 4, 2012. (Wexler Supp. Decl. at ¶ 21 & ex. C) The quote, a one-page document, states that Zero would sell 25,248 square feet of FS3003 INTUMET materials at $4.68 per square foot, and sets out a price discount schedule.

(*Id.*)

From September 13 to 18, 2012, Ebaugh and Wexler engaged in further discussions regarding the order. For example, Ebaugh and Wexler discussed the precise specifications Hardwire sought, including: (a) specific dimensions for the custom materials ("39.375" width x 79.25" length x .125" thickness"); (b) the requested color for the product ("'black or whatever is the quickest'"); (c) Hardwire's requested delivery dates for the first shipment of the materials; and (d) the inclusion of custom bags to ship the materials. (Wexler Supp. Decl. at ¶ 22; Keller Decl. at ¶ 11) Wexler then ordered the custom bags. (Wexler Supp. Decl. at ¶ 23) On November 2, 2012, Ebaugh contacted Wexler by e-mail to inform him that the dimensions of the discussed materials would have to change in width from a width of 39.375" to a width of 31". (*Id.* at ¶ 24)

Then, on November 5-6, 2012, Wexler and Ebaugh engaged in an e-mail exchange regarding the approximate amount of fireproof materials that Hardwire would require and the unit price of those materials. (*Id.* at ¶ 25 & ex. D) The e-mail conversation, as set out in the record, is as follows:

> Wexler to Ebaugh, November 5, 2012, 1:55 p.m.: "Any width is fine. We do not purchase feet, but pounds. We have a minimum of 500 lbs and so the quantity in feet will vary."
>
> Ebaugh to Wexler, November 5, 2012 [the time is unclear]: "We will need approximately 21,00 linear feet of product. Was this amount for the whole order?"
>
> Wexler to Ebaugh, November 5, 2012, 3:33 p.m.: "I do not know. As I said we do not purchase in feet but in pounds. We will also need to experiment with this wide material and so I cannot estimate yet before we try."

Ebaugh to Wexler, November 5, 2012, 11:55 p.m.: "Estimate what? We have bid a project at $4.60/ft2 based on your previous quote."

Wexler to Ebaugh, November 6, 2012, 8:14 a.m.: "I am sorry I thin[k] I misunderstood your original question. Our price of 4.60/sqft will not change."

Ebaugh to Wexler, November 6, 2012, 4:20 p.m.: "Thank you."

(*Id.*, ex. D)

### 3.    The Submission of the November 6, 2012 Purchase Order (Purchase Order 84310) and the Forum Selection Clause

On or about November 6, 2012, Ebaugh sent Purchase Order number 84310 (hereinafter, "Purchase Order 84310") to Wexler at Zero's New York office. (D.I. 9, ex. 8; Wexler Supp. Decl. at ¶ 28; Keller Decl. at ¶ 7)  Purchase Order 84310 called for Hardwire to purchase FS3003 INTUMET materials at $4.60 per square foot, at a total price of $78,480.00. (D.I. 9, ex. 8)

Included along with Purchase Order 84310 was Hardwire's Standard Terms and Conditions, a three-page document containing 30 enumerated paragraphs. (Wexler Supp. Decl. at ¶¶ 28-29 & ex. E; Keller Decl. at ¶ 7)  The first paragraph of the Standard Terms and Conditions states that "Acceptance of the Purchase Order is limited to the Terms and Conditions set forth herein." (Wexler Supp. Decl., ex. E at ¶ 1)  Paragraph 29 of the Standard Terms and Conditions contains a forum selection clause (hereinafter, the "Forum Selection Clause"), which states, in full: "Any dispute hereunder shall be adjudicated exclusively in, and subject to the laws of, the State of Delaware." (*Id.* at ¶ 29)

There is no dispute that Zero received Purchase Order 84310 and the Standard Terms and Conditions, on or about November 6, 2012. (Wexler Supp. Decl. at ¶¶ 28-29)  According to

Wexler, although Zero received the Standard Terms and Conditions, neither he nor any other employee of the company read the document; instead, Wexler states that Zero "rejected" those terms and conditions, though Zero did not communicate that rejection in any way to Hardwire. (D.I. 13, ex. B, Declaration of Elias Wexler (hereinafter, "Wexler Decl."), at ¶¶ 3-4; D.I. 20, June 24, 2014 Oral Argument Transcript (hereinafter "Tr.") at 33)

### 4. The Invoices

On or about March 15, 2013, Zero shipped 250 units of the requested INTUMET materials to Hardwire's Maryland office via United Parcel Service. (Complaint at ¶ 14; D.I. 9, ex. 3) On or around the same date, Zero sent Hardwire an invoice seeking payment for these materials in the amount of $24,385.14, including shipping charges (the "March 2013 Invoice"). (D.I. 9, ex. 3; Tr. at 13-14) Subsequently, on April 30, 2013, Zero completed Hardwire's order by shipping 600 units of the materials to Hardwire's Maryland office. (Complaint at ¶ 15; D.I. 9, ex. 4)[2] On or around the same date, Zero sent Hardwire an invoice seeking payment for these materials in the amount of $58,060.69, including shipping charges (the "April 2013 Invoice," and collectively with the March 2013 Invoice, the "Invoices"). (Complaint at ¶ 15; D.I. 9, ex. 4)[3]

---

[2]      The Complaint alleges (and the Invoices appear to support this) that the entirety of the order was shipped via common carrier to Hardwire at its Maryland office by Zero, in the two shipments referenced above. (Complaint at ¶¶ 14-15; D.I. 9, exs. 3-4) In one of his declarations, in contrast, Wexler notes that a portion of this order was picked up by Hardwire at Zero's New York office, with the remainder being sent via common carrier. (D.I. 4-1 at ¶ 6) The discrepancy is not material as to the issues addressed herein.

[3]      While Purchase Order 84310 calls for a total order of 1,000 units of the materials in question, the Invoices, taken together, indicate that only 850 units were shipped (in return for a total purchase price nearly identical to that referred to in Purchase Order 84310, and based on the same price per square foot—$4.60—set out in Purchase Order 84310). (D.I. 9, exs. 3, 4 & 8) Neither party, including Hardwire, has suggested that these particular unit-related differences are material to the issues at play here, and the Court will thus hereafter assume that they are not. (Tr.

There is no dispute that Hardwire received these Invoices on or about the dates they were sent. (Keller Decl. at ¶ 8)

In addition to containing numerical data, the address information of the parties, and information about the quantity and price of the materials delivered, the one-page Invoices each contain two provisions relating to rights or obligations associated with the transaction. (D.I. 9, exs. 3 & 4) One of these provisions regards how and when returns of the materials should be made (and how the costs associated with such returns are to be allocated between the parties); the other is a statement to the effect that Zero's customers will be responsible for all collection and attorney's fees on past due invoices. (*Id.*) Immediately below these two provisions (hereinafter, "Zero's return policy" and "Zero's past due invoice policy," respectively) each Invoice reads "Thank you for your order. We appreciate your business. Sincerely, Elias Wexler, President." (*Id.*)

In total, the Invoices called for a payment of $82,445.83 ($80,806.68 plus shipping costs). (*Id.*) Hardwire thereafter paid the Invoices in full. (Complaint at ¶¶ 16, 18; D.I. 4-1 at ¶ 7; D.I. 4, ex. B; Keller Decl. at ¶ 8)

### 5.    Alleged Breach of Contract

Upon receipt of the materials, Hardwire conducted tests on them. (Complaint at ¶¶ 19, 21) These tests purportedly demonstrated that the materials ultimately did not meet certain performance standards that had been contractually promised by Zero. (*Id.* at ¶¶ 20, 23) This alleged failure is the impetus for Hardwire's current breach of contract claim.

---

at 61 (Hardwire's counsel not disputing that the Invoices reflected the entirety of the materials that were a part of the agreed-upon transaction at issue set out in Purchase Order 84310))

## B.     Procedural History

This case has a confusing procedural history and has now touched three separate courts, as is set out further below.

### 1.     The District of Maryland Lawsuit

On November 13, 2013, Hardwire filed a breach of contract claim against Zero in the United States District Court for the District of Maryland, asserting that diversity jurisdiction existed. (D.I. 9, ex. 7 (hereinafter "Maryland Complaint") at ¶ 3) In the Maryland Complaint, Hardwire identified Zero as a New York corporation. (*Id.* at ¶ 2) At the time it filed the Maryland Complaint, counsel for Hardwire was unaware that the Standard Terms and Conditions (containing the Forum Selection Clause) had been sent to Zero along with Purchase Order 84310. (D.I. 9 at 2 n.3)

In response, Zero filed a motion to dismiss for lack of personal jurisdiction and improper venue (the "Maryland Motion to Dismiss"), pursuant to Rules 12(b)(2) and 12(b)(3), respectively. (*Id.*, ex. 5 at 6) Zero also asked the District of Maryland to alternatively consider transfer to a federal court in New York, or to the District of Delaware. (*Id.* at 19)

Thereafter, on or around December 5, 2013, Hardwire voluntarily withdrew the Maryland Complaint. (D.I. 9 at 3) Hardwire contends it did so for two reasons. First, Hardwire states that it relied at the time upon the contents of a declaration submitted by Wexler in support of the Maryland Motion to Dismiss; in this declaration (hereinafter, the "Maryland Declaration"), Wexler asserted that Zero was a Delaware corporation—a fact which, if true, would have destroyed diversity jurisdiction in the District of Maryland or any federal court. (*Id.*; *see also id.*,

ex. 6 ("Maryland Declaration") at ¶ 2)[4]  Second, Hardwire notes that in its briefing

accompanying the Maryland Motion to Dismiss, it was Zero who first pointed out that Purchase

Order 84310 was sent along with the Standard Terms and Conditions, which in turn included the

Forum Selection Clause. (D.I. 9 at 2-3)  Zero asserted in that briefing that if the Forum Selection

Clause was "valid and enforceable" then "venue would lie in the State of Delaware[,]" and that

Hardwire "may opt to bring this action in State Court or, if diversity jurisdiction is appropriate,

Federal Court, District of Delaware, but not in Maryland." (*Id.* at 3; *see also id.*, ex. 5 at 6, 18)

Hardwire contends that Zero's statements caused it to question whether diversity jurisdiction

existed at all, but to conclude that regardless, were the case re-filed in a court located in the State

of Delaware, Zero would not contend that it had been improperly filed there.

## 2.     The Delaware Superior Court Lawsuit

On December 11, 2013, Hardwire filed the instant suit against Zero in the Delaware

Superior Court. (Complaint)  The Complaint alleged an identical cause of action to that asserted

in the Maryland Complaint, and once again referred to Zero as a New York corporation. (*Id.* at ¶

2)  In response, on January 16, 2014, Zero removed the case to this Court. (D.I. 1)

## 3.     Proceedings in this Court

On January 23, 2014, Zero filed the instant Motion. (D.I. 4)  Thereafter, on March 6,

2014, Chief Judge Leonard P. Stark referred this case to the Court to hear and resolve all pretrial

matters, up to and including the resolution of case-dispositive motions. (D.I. 11)  The instant

motion was fully briefed as of the same day, (D.I. 12), and the Court heard oral argument on the

---

[4]        Zero now states that this assertion by Wexler was incorrect and was made due to
an error by Wexler and his counsel. (D.I. 4-1 at ¶¶ 2, 10; D.I. 5 at 5 n.1)  There is now no dispute
that Zero is a New York corporation and that diversity jurisdiction exists as to this matter.

motion on June 24, 2014, (D.I. 20).

During oral argument, the Court determined that the parties had not sufficiently addressed in their briefing, *inter alia*, how the Uniform Commercial Code ("U.C.C.") and relevant case law impacted the disposition of Zero's Motion; the Court thereafter ordered supplemental letter briefing on that subject. (D.I. 17) Additionally, at oral argument, Zero appeared to indicate that it wished to supplement the factual record before the Court as to the Motion; the Court thereafter ordered that Zero confirm that this was its wish, and, if so, that Zero provide "a rationale for how such supplementation/discovery would be relevant to the Motion's resolution and how permitting it would be legally appropriate at this stage of the proceeding[.]" (D.I. 17 at 1-2; *see also* Tr. at 109-11) After reviewing the parties' supplemental letter briefing, (D.I. 18; D.I. 19), the Court permitted both parties to further supplement the record in the manner they had requested, (D.I. 21); *cf. Peninsula Advisors, LLC v. Fairstar Res. Ltd.*, C. A. No. 10-489-LPS, 2014 WL 491671, at *3 & n.3 (D. Del. Feb. 5, 2014) ("A court has discretion to grant leave to supplement the record of a case.") (internal quotation marks and citations omitted). Thereafter, by July 31, 2014, both parties provided supplemental declarations, which the Court has fully considered in resolving the instant Motion. (D.I. 22, 23)

## II. DISCUSSION

### A. Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

#### 1. Standard of Review

Rule 12(b)(2) requires the Court to dismiss any case in which it lacks personal jurisdiction. Fed. R. Civ. P. 12(b)(2). As an initial matter, if a jurisdictional defense is raised by way of a Rule 12(b)(2) motion, then the plaintiff bears the burden of showing the basis for

11

jurisdiction. *Eastman Chem. Co. v. AlphaPet Inc.*, Civ. Action No. 09-971-LPS-CJB, 2011 WL 6004079, at *3 (D. Del. Nov. 4, 2011); *Power Integrations, Inc. v. BCD Semiconductor Corp.*, 547 F. Supp. 2d 365, 369 (D. Del. 2008). To satisfy its burden at this stage of the litigation, in a case where the district court has not held an evidentiary hearing, the plaintiff must only establish a prima facie case of personal jurisdiction. *Metcalfe v. Renaissance Marine Inc.*, 566 F.3d 324, 330 (3d Cir. 2009); *Sam Mannino Enters., LLC v. John W. Stone Oil Distrib., LLC*, — F. Supp. 2d —, 2014 WL 2809385, at *2 (W.D. Pa. June 23, 2014); *Power Integrations, Inc.*, 547 F. Supp. 2d at 369. All factual inferences to be drawn from the pleadings, affidavits and exhibits must be drawn in the plaintiff's favor at this stage. *Eastman Chem. Co.*, 2011 WL 6004079, at *3; *Power Integrations, Inc.*, 547 F. Supp. 2d at 369; *Brautigam v. Priest,* No. 99-365-SLR, 2000 WL 291534, at *2 (D. Del. Mar. 2, 2000) (citing cases).[5]

"To establish personal jurisdiction, the plaintiff must adduce facts sufficient to satisfy two requirements—one statutory and one constitutional." *Eastman Chem. Co.*, 2011 WL 6004079, at *3. First, the Court must consider whether the defendant's actions fall within the scope of Delaware's long-arm statute, Del. Code tit. 10, § 3104(c). *Id.*; *Power Integrations, Inc.*, 547 F.

---

[5]     The Court notes that it has provided the parties with every opportunity, at various stages, to make a more full factual record regarding the Motion and to inform the Court as to how they wished to do that. (Tr. at 15-18, 99-111; D.I. 17; D.I. 21-23) Ultimately, neither party requested that the Court hold an evidentiary hearing; instead, both chose to simply supplement the record with additional declarations and documentary evidence. (*See* D.I. 18 at 1-2; D.I. 19 at 3; D.I. 22; D.I. 23) In such a circumstance, the law is clear that where no evidentiary hearing has been held, the Court must utilize the prima facie case standard set out above. *Metcalfe*, 566 F.3d at 330-31 (finding that where the district court did not hold an evidentiary hearing, but considered a sworn affidavit and other documentary evidence in deciding a Rule 12(b)(2) motion, the Court must determine whether the plaintiffs have established a prima facie case of personal jurisdiction); *see also Smith v. Integral Consulting Servs., Inc.*, Civil Action No. 14-597, 2014 WL 4828972, at *6 & n.2 (W.D. Pa. Sept. 29, 2014); *AlliedBarton Sec. Servs., LLC v. Onyx on the Bay*, No. 08-3583, 2009 WL 5102512, at *3-4 (E.D. Pa. Dec. 17, 2009).

Supp. 2d at 369. Second, the Court must determine whether the exercise of jurisdiction comports with the defendant's right to due process. *Eastman Chem. Co.*, 2011 WL 6004079, at *3 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *Power Integrations, Inc.*, 547 F. Supp. 2d at 369. Due process is satisfied if the Court finds that "'minimum contacts'" exist between the non-resident defendant and the forum state, "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Power Integrations, Inc.*, 547 F. Supp. 2d at 369 (quoting *Int'l Shoe Co.*, 326 U.S. at 316).

However, the personal jurisdiction requirement is a waivable right. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985); *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703-04 (1982). For example, contractual partners are free to voluntarily consent to personal jurisdiction in a chosen forum through agreement to the inclusion of a forum selection clause in their contract; where such forum selection provisions are freely negotiated and otherwise not unreasonable or unjust, their enforcement does not offend due process. *Burger King Corp.*, 471 U.S. at 472 n.14; *Ins. Corp. of Ir., Ltd.*, 456 U.S. at 703-04; *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9-12 (1972). "When a party is bound by a forum selection clause, the party is deemed to have expressly consented to personal jurisdiction." *Eastman Chem. Co.*, 2011 WL 6004079, at *4; *see also Solae, LLC v. Hershey Can., Inc.*, 557 F. Supp. 2d 452, 456 (D. Del. 2008); *Res. Ventures, Inc v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 431 (D. Del. 1999). Thus, once a valid forum selection is in effect, "a minimum contacts analysis [under the Delaware long-arm statute and Due Process Clause of the U. S. Constitution] is not required." *Eastman Chem. Co.*, 2011 WL 6004079, at *4 (internal quotation marks and citation omitted); *see also Solae, LLC*, 557 F. Supp. 2d at 456; *Res. Ventures, Inc.*, 42 F. Supp. 2d at 431-32.

## 2. Analysis

In Zero's Rule 12(b)(2) motion, it takes the position that the Forum Selection Clause was not a part of the parties' contractual agreement regarding the provision of fireproof materials from Zero to Hardwire. (D.I. 18) Instead, although its position has been a constantly shifting one, Zero now argues that the parties had entered into a complete oral agreement (one that did not include the Forum Selection Clause) well before Hardwire sent Zero the Standard Terms and Conditions along with Purchase Order 84310. (*Compare* D.I. 12 at 3-4 (Zero at first arguing in its reply brief that the Forum Selection Clause was not binding on it because after Hardwire submitted its Standard Terms and Conditions, Zero rejected those terms), *with* D.I. 18 at 4 (Zero now arguing in a supplemental letter brief that the Forum Selection Clause was not binding on it because the parties had previously entered into an oral agreement, prior to Hardwire's submission of the Standard Terms and Conditions)) And since Hardwire does not contend that this Court has personal jurisdiction over Zero other than through the implementation of the Forum Selection Clause, Zero argues that its Rule 12(b)(2) motion should be granted. (D.I. 18 at 4) For its part, Hardwire disagrees, arguing that the Forum Selection Clause was a part of the parties' contractual agreement, and that as a result, Zero has waived any right to challenge personal jurisdiction in this Court. (D.I. 9 at 4-7)

To adjudicate this issue utilizing the standard of review set out above, the Court must address three questions.[6] First, the Court must decide what law should be applied in resolving

---

[6]     If a forum selection clause is, in fact, part of a contractual agreement between two parties, it is presumptively valid and will be enforced by that forum, unless the objecting party establishes that: (1) it is the result of fraud or overreaching; (2) enforcement would violate a strong public policy of the forum; or (3) enforcement would, under the circumstances, result in a jurisdiction so seriously inconvenient as to be unreasonable. *Coastal Steel Corp. v. Tilghman*

this portion of the Motion. Second, the Court must determine whether, as Zero alleges, an oral contract between the parties (one not including a forum selection clause) existed before Hardwire submitted Purchase Order 84310 to Zero. Third, if no such oral contract existed by that point, then the Court must assess whether a legal contract was ever entered into between the parties, and if so, whether the Forum Selection Clause was included as one of that contract's terms.

### a.    What Law Should be Applied?

"When jurisdiction is based upon diversity of citizenship, a district court must apply the forum state's choice of law rules." *Pa. Emp., Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 466 (D. Del. 2010). As this case was commenced in Delaware, (D.I. 1), the Court will apply Delaware's choice of law rules.

When ascertaining what law should be applied, Delaware employs a two-pronged approach, where the court must: (1) compare laws of the competing jurisdictions to determine whether laws actually conflict on a relevant point, and then, if actual conflict exists; (2) apply the "most significant relationship" test. *Pa. Emp., Benefit Trust Fund*, 710 F. Supp. 2d at 466-67 (internal quotation marks and citations omitted). "However, before a choice of law question arises, there must actually be a conflict between the potentially applicable bodies of law. . . . [where there is no such conflict] the court should avoid the choice of law question." *On Air Entm't Corp. v. Nat'l Indem. Co.*, 210 F.3d 146, 149 (3d Cir. 2000) (citations omitted). That is, where there is no conflict of laws, the court can apply the laws of the relevant states

---

*Wheelabrator Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983); *QVC, Inc. v. Your Vitamins, Inc.*, 753 F. Supp. 2d 428, 432 (D. Del. 2010). Here, Zero does not assert that the Forum Selection Clause is invalid and unenforceable for one of these reasons; instead, the entire dispute is over whether the clause was a part of the parties' contractual agreement in the first place. *Cf. Sam Mannino Enters.*, 2014 WL 2809385, at *3.

interchangeably in discussing the law applicable to the case. *Id.*; *see also Pa. Emp., Benefit Trust Fund*, 710 F. Supp. 2d at 466-67.

In their briefing, Hardwire and Zero did not address the question of what state's law applies in any significant detail, but they did at least make reference to the court systems in three different states: Delaware, Maryland and New York. (D.I. 5; D.I. 9; D.I. 12) Because this case deals with a dispute regarding the sale of goods, and because all three of these states have adopted the relevant provisions of the U.C.C. into their statutory scheme without modification, the Court finds that no conflict of law exists. *See, e.g.*, Del. Code tit. 6, § 2-207; Md. Code, Com. Law § 2-207; NY U.C.C. Law § 2-207. Indeed, during oral argument both parties agreed that the Court should simply apply the provisions of the U.C.C. to the instant case, (Tr. at 28-30, 65), an approach the United States Court of Appeals for the Third Circuit has taken under similar circumstances, *see, e.g.*, *Step-Saver Data Sys., Inc v. Wyse Tech.*, 939 F.2d 91, 94 n.6 (3d Cir. 1991) (finding that where the case involved a dispute over the sale of goods within the meaning of the U.C.C., although the parties disputed whether Pennsylvania or Georgia law governed the issues of contract formation and modification, the Court would simply apply the relevant U.C.C. provisions, because both states had adopted, without modification, the relevant portions of Article 2 of the U.C.C.).

For all of these reasons, then, the Court will turn to the terms of U.C.C. for primary guidance as to this dispute.

### b. Was there an Oral Contract?

As noted above, Zero's present contention is that it had a binding oral agreement[7] with

Hardwire, pursuant to U.C.C. § 2-204, before Hardwire submitted Purchase Order 84310 on

November 6, 2012. (D.I. 18 at 1, 4; Tr. at 37); *see also* U.C.C. § 2-204(1) ("A contract for the

sale of goods may be made in any manner sufficient to show agreement, including conduct by

both parties which recognizes the existence of such a contract."). If this is correct, Zero asserts,

then the submission of Purchase Order 84310 simply constituted a written confirmation of that

agreement—and the accompanying Forum Selection Clause (included as part of the attached

Standard Terms and Conditions) amounted to a material alteration to that agreement that is not

enforceable under U.C.C. § 2-207. (D.I. 18 at 1-4); *see also* U.C.C. § 2-207(2)(b) (noting that

additional terms proposed along with written confirmation of an existing agreement do not

become part of that agreement if they "materially alter it").[8]

---

[7]    Under the common law of Maryland, New York and Delaware, the party asserting
that an oral contract existed (here, Zero) typically bears the burden to establish its existence. *See,
e.g., Bontempo v. Lare*, 217 Md. App. 81, 136 (Md. Ct. Spec. App. 2014); *Lippo v. Cruz*, 988
N.Y.S.2d 523, 2014 WL 837096, at *2 (N.Y. Sup. Ct. Mar. 3, 2014); *Schwartz v. Chase*, Civil
Action No. 4274-VCP, 2010 WL 2601608, at *4 (Del. Ch. June 29, 2010). But here, because
this issue is arising in the context of review of a Rule 12(b)(2) motion—where Hardwire bears
the ultimate burden to demonstrate the basis for personal jurisdiction—the Court does not find it
appropriate to shift any part of that burden to Zero when considering the parties' arguments as to
whether an oral contract existed. Instead, the Court assumes that at all points herein, the burden
remains on Hardwire to demonstrate the existence of a prima facie case for personal jurisdiction.
*See, e.g., Intetics Co. v. Adorama Camera, Inc.*, No. 11 C 6385, 2012 WL 2061916, at *1-3
(N.D. Ill. June 4, 2012) (reviewing a Rule 12(b)(2) motion—in which the defendant argued that a
forum selection clause in a written agreement could not confer personal jurisdiction over it
because it had not signed the agreement, and instead argued that the parties had reached only a
prior "'oral understanding[,]'"—by noting that it was, at all stages, the plaintiff's burden to make
out a prima facie case for personal jurisdiction) (internal citation omitted).

[8]    Hardwire does not appear to contest that *if* the parties had entered into a valid oral
contract at the time suggested by Zero, then the later introduction of the Forum Selection Clause
would amount to a material alteration to that contract under § 2-207(2)(b). (D.I. 19) And indeed,
legal authority indicates that a proposal to add a forum selection clause to the terms of an already

Conversely, Hardwire asserts that no prior oral contract existed, and that the submission of Purchase Order 84310 amounted to an offer to purchase goods sent from one merchant to another, under the terms set out therein. (D.I. 19 at 1-2 (citing U.C.C. § 2-201(2))) It contends that Zero's subsequent delivery of the ordered goods amounted to acceptance of that offer through performance, and that Zero's failure to disclaim the Standard Terms and Conditions (including the Forum Selection Clause) amounted to acceptance of those terms by Zero. (*Id.* at 1)

In order to assess whether a prior oral agreement existed between the two parties, the Court turns, by way of example, to Delaware contract law:

> "Under Delaware law[,] a contract comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound by their agreement on all essential terms." *Rohm and Haas* [*Elec. Materials, LLC v. Honeywell Int'l, Inc.*, C.A. No. 06-297-GMS,] 2009 WL 1033651, at *5 [(D. Del. Apr. 16, 2009)] (quotations and citations omitted) . . . . A contract contains all essential terms and is therefore enforceable when "it establishes the heart of the agreement;" it need not, however, contain all terms as some matters may be left for future negotiation.

existing agreement amounts to a proposal to materially alter that agreement. *See, e.g., Daisey Indus., Inc. v. Kmart Corp.*, No. 96 Civ. 4211 AGS RLE, 1997 WL 642553, at *3-4 (S.D.N.Y. Oct. 17, 1997) (holding that purchase orders issued subsequent to an oral agreement between the parties constituted written confirmation of that agreement, and that the inclusion of a forum selection clause in those purchase orders amounted to a material alteration of the contract under U.C.C. § 2-207(2), requiring express consent of the other party before it became a part of the contract); *Pfizer Inc. v. Advanced Monobloc Corp.*, No. 97C-04-037, 1998 WL 110129, at *2-3 (Del. Super. Ct. Jan. 23, 1998) (finding that inclusion of forum selection clause amounted to inclusion of a term that materially altered an existing contract, pursuant to the meaning of U.C.C. § 2-207(2)); *Lorbrook Corp. v. G & T Indus., Inc.*, 562 N.Y.S.2d 978, 980 (N.Y. App. Div. 1990) ("Had such a prior oral agreement been reached, defendant's purchase orders would be nothing more than a request to ship a portion of the goods covered by that agreement, and the insertion of the forum selection clause would then be an unsuccessful ploy by defendant unilaterally to add a term not covered by the preexisting binding contract.").

> *Parker–Hannifin* [*Corp. v. Schlegel Elec. Materials, Inc.*], 589 F.
> Supp. 2d [457,] 463 (D. Del. 2008)]. In other words, "[u]ntil it is
> reasonable to conclude, in light of all of these surrounding
> circumstances, that all of the points that the parties themselves
> regard as essential have been expressly or . . . implicitly resolved,
> the parties have not finished their negotiations and have not formed
> a contract." *Leeds* [*v. First Allied Conn. Corp.*], 521 A.2d [1095,]
> 1102 [(Del. Ch. 1986)]. In short, "an enforceable contract exists
> where a reasonable person would conclude that the parties had
> reached a definite and final agreement on all essential terms."
> *Rohm and Haas*, 2009 WL 1033651, at *5.

*Maya Swimwear Corp. v. Maya Swimwear, LLC*, 855 F. Supp. 2d 229, 234 (D. Del. 2012); *see*

*also Tel. & Data Sys., Inc. v. Eastex Cellular L.P.*, CIV. A. No. 12888, 1993 WL 344770, at *8-9

(Del. Ch. Aug. 27, 1993) (explaining that in determining whether a binding oral contract arose,

"[t]he relevant inquiry is whether [the relevant] communications, viewed objectively from the

standpoint of a reasonable person, manifested an intention of the parties to be contractually

bound at that stage").[9] Relatedly, U.C.C. § 2-204 also reflects the common law principle that a

meeting of the minds on all essential contract terms is critical for contractual formation, whether

the parties manifest their intent to be bound by word, act or conduct. *See PCS Sales (USA), Inc.*

*v. Nitrochem Distribution Ltd.*, No. 03 CIV.2625(SAS), 2004 WL 944541, at *3 (S.D.N.Y. May

---

[9]      A court analyzing a U.C.C./sale of goods contract case may turn to the common
law for guidance regarding basic contract law tenants. *See, e.g., PCS Sales (USA), Inc. v.*
*Nitrochem Distribution Ltd.*, No. 03 Civ.2625(SAS), 2004 WL 944541, at *3 n.47 (S.D.N.Y.
May 3, 2004); *USEMCO, Inc. v. Marbro Co., Inc.*, 483 A.2d 88, 92 (Md. Ct. Spec. App. 1984);
*see also* U.C.C. § 1-103(b). The common law of New York and Maryland employs similar
objective tests in determining whether parties formed enforceable agreements. *See, e.g., Audio*
*Visual Assocs., Inc. v. Sharp Elecs. Corp.*, 210 F.3d 254, 258 (4th Cir. 2000) (noting that under
Maryland law, the essential requirement for contract formation is "that there be an objective
manifestation of mutual assent by the parties") (citing cases); *PMJ Capital Corp. v. PAF Capital,*
*LLC*, 949 N.Y.S.2d 385, 387 (N.Y. App. Div. 2012) (explaining that "[i]n determining whether
the parties entered into a contractual agreement and what were its terms, it is necessary to look . .
. to the objective manifestations of the intent of the parties as gathered by their expressed words
and deeds") (internal quotation marks and citation omitted).

3, 2004) (citing N.Y. U.C.C. § 2-204). Although a court may recognize a contract based on conduct under U.C.C. § 2-204 and § 2-207(3), "this is only appropriate where the parties' undisputed actions 'clearly manifest[ ] mutual recognition that a binding obligation was undertaken.'" *Id.* at \*5 (quoting *Hornell Brewing Co., Inc. v. Spry*, 664 N.Y.S.2d 698, 701 (N.Y. Sup. Ct. 1997)). "In other words, where the parties behave as though they have a contract, courts will recognize the existence of that contract, whether or not the precise moment of agreement may be determined"; on the other hand, where there is "*inconsistent* behavior that suggests the absence of mutual assent" or when the "conduct of the parties acknowledges that an agreement has *not yet been reached*," the parties should not yet be bound to an agreement. *Id.* at \*3, \*5 (internal quotation marks and citation omitted) (emphasis in original).

With this law in mind, the Court next turns to the record. After careful review, the Court concludes that Hardwire—which must get the benefit of all factual inferences at this stage—has sufficiently demonstrated that no oral contract (i.e., a contract not containing the Standard Terms and Conditions) existed prior to the submission of Purchase Order 84310. The Court comes to this conclusion for two primary reasons, set forth below.

The first and most important reason is that the record evidence indicates that during the August 23, 2012 meeting, Ebaugh and Keller (on behalf of Hardwire) told Wexler (on behalf of Zero) that "this upcoming large order needed to include Hardwire's Standard Terms and Conditions." (Keller Decl. at ¶ 6) Keller, a participant at the meeting, confirms this in his declaration, and states that "Wexler did not object or voice any concerns regarding Hardwire's Standard Terms and Conditions." (*Id.*)

The written record also supports Keller's assertion. In his August 20, 2012 pre-meeting

e-mail to Wexler, Ebaugh noted that Hardwire's agenda for the meeting included discussion of "the upcoming project, material availability, *T&C's*, etc." (Wexler Supp. Decl., ex. B (emphasis added)) The record makes clear that when Hardwire made this reference to "T&C's" in the e-mail, it was referring to the Standard Terms and Conditions document that it later sent along with Purchase Order 84310. (Keller Decl. at ¶ 5 (noting that "[t]he reason that the [Standard Terms and Conditions] were explicitly referenced in this e-mail was because, from Hardwire's perspective, [they] needed to be included in Hardwire's future order for the large quantity of product from Zero")) Therefore, the fact that Ebaugh (in the August 20 e-mail) said that he *would* discuss the Standard Terms and Conditions at the August 23, 2012 meeting supports the conclusion that they *were in fact discussed* at that meeting, in the manner described in Keller's declaration.

Moreover, Zero's evidence does not contradict Keller's assertion on this point. Although Wexler states in his supplemental declaration that the parties never discussed a forum selection clause during the August 23, 2012 meeting,[10] (Wexler Supp. Decl. at ¶ 20), he does not assert that Hardwire's representatives never referenced Hardwire's Standard Terms and Conditions during the meeting. (*Id.*) Nor does Wexler dispute that, at this meeting, Hardwire emphasized that the Standard Terms and Conditions would be an essential part of any final agreement. (*Id.*)

The second reason for the Court's conclusion is that the current record does not demonstrate (as Zero claims it does) that all material terms of the agreement were negotiated and agreed to by both sides at the August 23, 2012 meeting (and were later confirmed by Zero's

---

[10]     This fact is not disputed, as both sides agree that a forum selection clause was not specifically referenced in the meeting. (Wexler Supp. Decl. at ¶ 20; Keller Decl. at ¶ 6)

September 4, 2012 written quote). (D.I. 18 at 2) When Zero articulates what those material terms were (it alternately refers to them as the "terms and conditions of Hardwire's anticipated order[,]" the "terms of Hardwire's order" or the "salient terms of the sale"), it asserts that they included not only terms such as price or the product's physical properties, but also the "non-standard, custom-order dimensions that Hardwire required[.]" (*Id.*; Wexler Supp. Decl. at ¶ 19) And yet the record clearly shows that after the August 23, 2012 meeting (and after the September 4, 2012 quote), at a minimum, the parties continued to alter the custom dimensions of the materials at issue.[11] For example, from September 13 though September 18, 2012—weeks after the August 23, 2012 meeting and the September 4, 2012 quote—Hardwire provided Zero with new, "more precise" custom measurements affecting the width, length and thickness of any of the materials to be ordered ("39.375" width, [x] 79.25" length x .125" thickness"). (Wexler Supp. Decl. at ¶ 22) Then, on November 2, 2012, Hardwire contacted Zero to change the custom dimensions yet again—from "a width of 39.375" to a width of 31"." (*Id.* at ¶ 24)[12]

Indeed, Hardwire and Zero's principals continued to discuss the terms of an agreement right up the submission of Hardwire's November 6, 2012 Purchase Order 84310—discussions that can be read to indicate some uncertainty in the parties' minds as to exactly what those terms

---

[11]     Indeed, although the parties do not make mention of it, the agreed-upon price per square foot of the materials also appears to have changed from the time of the September 4, 2012 quote through Hardwire's submission of the November 6, 2012 Purchase Order 84310 (from $4.68 to $4.60), as did the agreed-upon amount of square feet of product to be shipped (from approximately 25,000 square feet to approximately 17,000 square feet). (*See* Wexler Supp. Decl., ex. C; D.I. 9, ex. 8)

[12]     (*Cf.* Keller Decl. at ¶ 11 ("At the time the written quote was issued, all parties understood that, before Zero was obligated to sell the product, the parties were likely to have some additional communications regarding the exact measurements and specifications of the product."))

were. From November 5-6, 2012, Ebaugh (on behalf of Hardwire) and Wexler (on behalf of Zero) exchanged e-mail communications in which Ebaugh appears uncertain as to whether both parties are of like minds as to the dimensions of the ultimate order to be placed, and how those dimensions would affect the parties' prior discussion of price. (*Id.*, ex. D at 2 (November 5, 2012 e-mail from Ebaugh to Wexler indicating that "[w]e will need approximately 21,000 linear feet of product" and questioning "[w]as this amount for the whole order?"); *id.* (subsequent November 5, 2012 e-mail from Ebaugh to Wexler questioning whether Wexler's prior comments regarding Zero's method of ordering the materials would impact a previously-discussed price of $4.60 per square foot))[13]

Ultimately, under the applicable standard here, Hardwire has sufficiently demonstrated that it is not reasonable to conclude that it and Zero had formed a binding oral agreement prior to the submission of Purchase Order 84310 on November 6, 2012.[14] It was only along with the

---

[13]      Hardwire also puts forward evidence, in the form of Keller's declaration, to support its assertion that the formation of an oral contract under these circumstances does not comport with industry practice. (Keller Decl. at ¶¶ 9, 13-14 (noting that with regard to "large, custom-made, specialty orders" like this, "any rational commercial seller of goods of this type would not consider a sale made until a buyer (here, Hardwire) had issued a purchase order")) In considering whether the parties intended to be bound prior to the execution of an integrated writing, courts can consider industry practice. *See, e.g.*, *Tel. & Data Sys., Inc.*, 1993 WL 344770, at *12-13 (noting that if an "oral contract would have been inconsistent with industry practice, that makes it less likely that a reasonable person . . . would have understood [a party's] words to mean that [defendant] intended to be contractually bound" and concluding that the "weight of the evidence presented here demonstrates that negotiations to purchase cellular markets are customarily concluded with written, not oral, agreements"). The Court must draw factual inferences in Hardwire's favor on this point, and thus also accords this argument some weight.

[14]      In its supplemental brief, (D.I. 18 at 2), Zero cites to certain cases in which courts found that an oral contract existed between two parties. But in those cases, the evidence that the parties had clearly and definitively agreed to all essential terms of the agreement via an oral conversation was stronger than it is here. *See, e.g.*, *Miller v. Newsweek, Inc.*, 660 F. Supp. 852, 856 (D. Del. 1987) (finding that a valid and enforceable oral contract was formed during a

23

submission of that Purchase Order that Hardwire first provided (and that Zero first had the opportunity to review) Hardwire's Standard Terms and Conditions—the inclusion of which Hardwire had told Zero was an essential part of any agreement between them. *Cf. Globe Metallaurgical Inc. v. Westbrook Res. Ltd.*, No. Civ.A. 05-0585, 2006 WL 181687, at *2 (W.D. Pa. Jan. 23, 2006) (finding, in a U.C.C. case, that only after the date on which certain material terms first appeared in the parties' communications could the parties have reached a binding agreement on a contract between them). And the parties had been altering at least one "salient" term of that agreement, and were otherwise discussing (and questioning) the specifics of the agreement, right up until Hardwire's submission of the Purchase Order. Under these circumstances, the Court cannot find that Hardwire's proposal to include the Forum Selection Clause (via the submission of the Standard Terms and Conditions) amounted to a proposed material alteration to an already-existing oral agreement. *Cf. MidAtl. Int'l, Inc. v. AGC Flat Glass N. Am., Inc.*, Civil No. 2:12cv169, 2014 WL 504701, *3-5 (E.D. Va. Feb. 7, 2014) (finding in a U.C.C. case that the submission of a comprehensive purchase order was an offer later accepted by the plaintiff—when the plaintiff engaged in performance based on the requirements and specifications of the purchase order—and concluding that the plaintiff's contrary position

---

telephone conversation between parties, wherein the parties "set many of the important terms of the contract[,]" agreeing as to "the quantity of negatives, time, place, and manner of delivery, and even the price"); *Daisey Indus., Inc.*, 1997 WL 642553, at *1, *3 (finding that the parties reached an oral agreement, and that subsequently sent purchase orders were written confirmations thereof, where the defendant "telephoned [the plaintiff] to place an order for a definite quantity of the desired style at a definite price" and, indeed, the parties "reached a greater level of specificity, agreeing on colors, sizes and desired style"); *Lorbrook Corp.*, 162 A.D.2d at 72-73 (finding that purchase orders did not constitute offers, where letters pre-dating those purchase orders confirmed an oral agreement between the parties and covered the essential terms of a valid requirements contract).

"must fail because [it] ask[s] the [c]ourt to ignore a complete and unambiguous written document in favor of a vague composite of writings, letters, oral agreements, and course of dealings that would contain several components that are incorporated into the purchase order anyway").[15]

### c. Did a Contract Exist that Included the Forum Selection Clause?

Next, the Court assesses when an offer containing all essential terms of the contract between the parties was first made. In doing so, it notes that Hardwire's November 6, 2012 submission of Purchase Order 84310 to Zero included in writing, for the first time, all of the essential terms of an agreement that Hardwire and Zero had discussed. That is, it included: (1) the essential terms that Zero has identified (*inter alia*, notation of the particular FS3003 INTUMET fireproof materials to be ordered, the custom-ordered dimensions for those materials sought by Hardwire, and pricing terms); and (2) Hardwire's Standard Terms and Conditions (including the Forum Selection Clause), which Hardwire had previously indicated would be essential, from its point of view, to completion of an agreement. Hardwire has made out a prima facie case that this submission amounted to an offer to contract with Zero. (D.I. 19 at 1)

The Court next addresses whether, subsequent to that offer, the parties entered into a binding contractual agreement that included the Forum Selection Clause. Here, particularly instructive is the Third Circuit's decision in *Standard Bent Glass Corp v. Glassrobots Oy*, 333

---

[15]     *See also VTech Const., Inc. v. McGonigle*, C.A. No. 09-970-SLR, 2011 WL 30985, at *4 (D. Del. Jan. 5, 2011) (finding that a meeting and subsequent e-mails between parties did not form an enforceable contract where the e-mail exchanges supported the conclusion "that negotiations were ongoing and essential terms never agreed upon"); *Tel. & Data Sys., Inc.*, 1993 WL 344770, at *14 (rejecting the argument that all terms that would have been essential to the formation of a binding contract had been negotiated and agreed upon orally, where the relevant telephone conversations "were not as well-defined as [plaintiff] portrays them, nor were the terms other than price as unimportant as [plaintiff] suggests").

F.3d 440 (3d Cir. 2003).

In *Standard Bent*, plaintiff Standard Bent Glass ("Standard Bent") brought suit against defendant Glassrobots Oy ("Glassrobots"). *Standard Bent*, 333 F.3d at 442. The two companies had been negotiating over a potential agreement in which Glassrobots would sell Standard Bent a glass fabricating system. *Id.* On February 1, 1999, Standard Bent faxed Glassrobots an offer sheet, which included proposed terms and conditions (such as quantity, price, and payment terms), along with a request that Glassrobots sign the offer sheet. *Id.* The next day, February 2, 1999, Glassrobots responded by sending Standard Bent its own cover letter, invoice and standard sales agreement, but in doing so, it did not return or refer in any way to Standard Bent's prior offer. *Id.* Later that same day, February 2, Standard Bent faxed a return letter to Glassrobots that appeared to accept Glassrobots' sales agreement and additionally requested that five specific changes be made to the agreement. *Id.* Two days later, on February 4, 1999, Standard Bent wired a down payment regarding the agreement. *Id.* Thereafter, the parties engaged in additional correspondence, though both parties ultimately did not sign the same sales agreement. *Id.* at 443. Nevertheless, they continued to fully perform (with Glassrobots installing the system and Standard Bent later making full payment). *Id.* A dispute over defects in the system later arose, giving rise to the litigation between the parties. *Id.*

At issue in the appeal in *Standard Bent* was whether there was a valid agreement between the parties and whether it included a binding arbitration clause. *Id.* The standard sales agreement that Glassrobots sent to Standard Bent on February 2, 1999 had included reference to arbitration as the method of dispute resolution, and it specifically made reference to certain industry guidelines (guidelines that, in turn, provided for a binding arbitration clause for all

contractual disputes). *Id.* at 443-44. Although the cover letter that Glassrobots sent along with the sales agreement stated that a copy of those industry guidelines were enclosed, Standard Bent later claimed that the guidelines had not, in fact, been included with the letter. *Id.* at 443-44 & n. 3. Additionally, Standard Bent's president averred that he never saw these guidelines during the time of the February 1999 negotiations, that he disliked arbitration clauses, and that he sought to avoid any such contract provisions whenever possible. *Id.* at 444 n.5.

The Third Circuit ultimately concluded that the arbitration clause was a part of the parties' contractual agreement. In doing so, it looked to the provisions of U.C.C. § 2-207. The *Standard Bent* Court noted that, pursuant to Section 2-207(1), an offeree's "expression of acceptance or transmission of a written confirmation generally results in the formation of a contract." *Id.* at 445 (citing U.C.C. § 2-207(1)). The *Standard Bent* Court found that Standard Bent's February 2 communication to Glassrobots constituted a "definite and seasonal expression of acceptance of Glassrobots offer" because it had used "the Glassrobots standard sales agreement as a template and [had] authoriz[ed] a wire transfer of the down payment, [thus] demonstrat[ing Standard Bent's] intent to perform under the essential terms of Glassrobots's standard sales agreement." *Id.* at 446. The Court also found "[n]oteworthy" Standard Bent's "own immediate performance" on the February 2 agreement, including its February 4 wire transfer of a down payment to Glassrobots. *Id.* Lastly, the *Standard Bent* Court found that because Glassrobots' February 2 proposal had included sufficient references to the arbitration clause, and because "[w]here a buyer makes a definite and seasonable expression of acceptance of a seller's offer, a contract is formed on the seller's terms[,]" then Standard Bent had accepted the arbitration clause as part of the contractual agreement when it "did not alter or respond to"

27

that clause in its February 2 responsive communication. *Id.* at 447; *see also Globe Metallaurgical Inc.*, 2006 WL 181687, at *2 (finding that defendant's submission of an offer containing a forum selection clause was a part of the agreement between the parties, where the clause was included on the back of defendant's proposed contract, was received by the plaintiff, where the plaintiff never "did anything to indicate that it was not in agreement" with the clause, and where both parties thereafter performed on the contract).

In the present case, Hardwire has made out a prima facie case that Zero accepted Purchase Order 84310 through performance, and thus created a contract between the parties. (*See* D.I. 19 at 1) As in *Standard Bent*, here Hardwire has demonstrated that after its offer set out in Purchase Order 84310, Zero's subsequent shipment of the FS3003 INTUMET materials (along with the corresponding Invoices) constituted a "definite and seasonal expression of acceptance" of Hardwire's offer. And here, as in *Standard Bent*, in light of that acceptance, Hardwire has demonstrated that there is sufficient evidence that a contract was "formed on [Hardwire's] terms."[16] These terms included the Standard Terms and Conditions and the Forum Selection Clause—terms that (just like the plaintiff in *Standard Bent*) Zero "did not alter or respond to" at the time it shipped the materials.[17] Therefore, Hardwire has made a prima facie showing that,

---

[16]    The fact that Wexler claims that he did not read the Standard Terms and Conditions when he received them, and that he "rejected" them (without communicating such rejection to Hardwire) would not be a barrier to this conclusion. (D.I. 12, ex. B)  Wexler's statements are very similar to those made in *Standard Bent* by Standard Bent's president, regarding the arbitration clause at issue there. *Standard Bent*, 333 F.3d at 444 n.5, 448; *see also Globe Metallaurgical Inc.*, 2006 WL 181687, at *2-3.

[17]    The Invoices did not make reference to a forum selection clause, thought they did contain two new additional terms: (1) Zero's return policy; and (2) Zero's past due invoice policy.  (D.I. 9, exs. 2, 3, 4 & 8)  Since the Invoices did not make acceptance of the contract expressly conditional on Hardwire's assent to these two additional terms, and since the Invoices

28

upon delivery of these materials and submission of the Invoices, a contract between Zero and Hardwire was established—one that included the terms proposed by Hardwire, including the Forum Selection Clause.

### d.    Conclusion

For the reasons set out above, the Court finds that Hardwire has met its burden to show that: (1) an oral contract was not formed, pursuant to U.C.C. § 2-204, prior to submission of Purchase Order 84310; (2) a contract was entered into, pursuant to U.C.C. § 2-207, when Zero accepted Hardwire's order through performance and submission of its Invoices; and (3) the Forum Selection Clause was a valid and enforceable term of the parties' contract. Accordingly, Hardwire has met its burden at this stage to demonstrate personal jurisdiction over Zero. Consequently, the Court recommends that Zero's motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) be denied.

### B.    Zero's Motion to Dismiss for Insufficient Service of Process Pursuant to Fed. R. Civ. P. 12(b)(5)

The Court next addresses the Motion's request, pursuant to Rule 12(b)(5), that the

---

do not address the forum selection clause issue, nothing about their submission to Hardwire affects the Court's conclusion here. *See Standard Bent Glass*, 333 F.3d at 445 ("Under UCC section 2-207(1), the offeree's expression of acceptance or transmission of a written confirmation generally results in the formation of a contract. . . . This is true unless the offeree makes that expression or confirmation "'expressly conditional'" on the offeror's assent to the proposed additional or different terms."). The Court need not address whether Zero's inclusion of the return policy and past due invoice policy in the Invoices indicates that those terms are a part of the parties' agreement, as it is immaterial to the resolution of the dispute herein. *See Bounty Fresh, LLC v. J N.Y. Produce, Inc.*, No. 12-CV-2415 (FB)(JO), 2014 WL 1010833, at *5 (E.D.N.Y. Mar. 14, 2014) (noting that under U.C.C. § 2-207(2), "[w]hen the parties are two merchants, additional terms [in the accepting party's form] become part of a contract unless: '(a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.'") (citing N.Y. U.C.C. § 2–207(2)); *see also* U.C.C. § 2-207 cmt. 1.

Complaint be dismissed for insufficient service of process.

## 1.    Standard of Review

Rule 12(b)(5) requires the Court to dismiss any case in which service of process was insufficient. Fed. R. Civ. P. 12(b)(5). When a Rule 12(b)(5) motion is filed, "'the party asserting the validity of service bears the burden of proof on that issue.'" *Tani v. FPL/Next Era Energy*, 811 F. Supp. 2d 1004, 1025 (D. Del. 2011) (quoting *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 488 (3d Cir. 1993)).

Federal law governs service of process in diversity suits. *Hanna v. Plumer*, 380 U.S. 460, 463–64 (1965). Generally, service of process must conform to the dictates of Federal Rule of Civil Procedure 4. *Aviation Exch. Corp., Inc v. Nightclub Mgmt. & Dev., LLC*, Civ. No. 08-533-SLR, 2009 WL 605397, at *2 (D. Del. Mar. 10, 2009). Pursuant to Rule 4, a corporate defendant may be served by: (1) any manner prescribed in Rule 4(e)(1), namely a method authorized under Delaware law; or (2) hand-delivery of a copy of the summons and complaint to an officer of the party or its authorized agent. *See* Fed. R. Civ. P. 4(e) & (h); *see also Aviation Exch. Corp.*, 2009 WL 605397, at *2. At all times relevant here, Section 3104(d)(3) of Delaware's long-arm statute authorized service on nonresident defendants by certified mail "[w]hen the law of this State authorizes service of process outside the State[.]" Del. Code tit. 10, § 3104(d) ("Section 3104(d)").[18]

---

[18]    Del. Code tit. 10, § 3104(d) provides:

(d)  When the law of this State authorizes service of process outside the State, the service, when reasonably calculated to give actual notice, may be made:

(1)  By personal delivery in the manner prescribed for service within

## 2. Analysis

Zero argues that even if the Forum Selection Clause was a part of the parties' contractual agreement, Hardwire did not sufficiently serve process on it here. It claims that despite the provisions of Section 3104(d), Hardwire was not permitted to serve process on it via certified mail because Zero does not meet any of the requirements set out in Delaware's long-arm statute, Del. Code tit. 10, § 3104(c) ("Section 3104(c)"), regarding the type of nonresident entity that can be subject to personal jurisdiction in Delaware. (D.I. 5 at 17; D.I. 12 at 7-8; Tr. at 51-58)[19]

In related contexts, Delaware state courts have found that when a defendant voluntary consents to the existence of personal jurisdiction in Delaware, it has also implicitly consented to service of process by some means. For example, in *Hovde Acquisition, LLC v. Thomas*, No. CIV.A. 19032, 2002 WL 1271681 (Del. Ch. June 5, 2002), the plaintiff and two related defendants entered into an agreement containing a forum selection clause, such that the defendants had consented to suit in Delaware. *Hovde Acquisition*, 2002 WL 1271681, at *4. However, the agreement did not expressly include a consent to service of process issued by Delaware courts, nor did it prescribe the manner in which the defendants could be served. *Id.*

---

this State.

(2) In the manner provided or prescribed by the law of the place in which the service is made for service in that place in an action in any of its courts of general jurisdiction.

(3) By any form of mail addressed to the person to be served and requiring a signed receipt.

(4) As directed by a court.

[19]      The parties do not contest that if service via certified mail was permissible here, then Hardwire in fact complied by actually serving Zero via certified mail.

One of the defendants thereafter argued that neither service pursuant to Section 3104 nor any other recognized method of service was available to plaintiff under the law. *Id.* The Delaware Court of Chancery disagreed, reasoning that "[w]ithout the ability to serve process, [the defendant's] express consent to Delaware jurisdiction and venue found in the [agreement] would be. . . useless." *Id.* It therefore found that "[the] parties [to that agreement, including this defendant] must have reasonably expected to be served by some method of service that is appropriate under Delaware law." *Id.* The *Hovde Acquisition* Court went on to determine that it should, pursuant to that Court's rules, fashion an order providing that service at the home address of the defendant's registered agent was an appropriate method by which the defendant could be served, as that was a method "well suited to give [the defendant] actual notice of the pendency of this action." *Id.* at *5; *see also Alstom Power Inc v. Duke/Fluor Daniel Carribbean S.E.*, No. 04C-02-275 CLS, 2005 WL 407206, at *4 (Del. Super. Ct. Jan. 31, 2005) (holding that where a foreign defendant consented to personal jurisdiction in Delaware through an agreement to a forum selection clause, it therefore "has consented to service of process by some means[,]" such that it could be served through the Delaware Secretary of State).[20]

As was previously noted, "[o]nce a party has expressly consented to jurisdiction, a 'minimum contacts analysis [under the Delaware long-arm Statute and Due Process Clause of the U.S. Constitution] is not required.'" *Eastman Chem. Co.*, 2011 WL 6004079 at *4 (further

---

[20]     *Cf. Chrysler Capital Corp. v. Woehling*, 663 F. Supp. 478, 481 (D. Del. 1987) (examining Delaware law and holding that where a defendant consented to personal jurisdiction in any state or federal court in Delaware through its agreement to the terms of a Note, that consent also was an "implicit consent to venue in [the District of Delaware,]" as any "other interpretation would render the clause useless since a suit could not proceed without proper venue" and "proper venue might not exist if not for the jurisdiction selecting clause").

citation omitted). The Court is aware of no authority to support Zero's suggestion that, despite the presence of a forum selection clause in the parties' agreement, Hardwire would still be required to separately satisfy one of Section 3104(c)'s contacts-based requirements before being able to lawfully serve Zero with process. The Court rejects this argument, as it would not only offend the rationale set out in *Hovde Acquisition*, but would skirt a principle underlying the utilization of forum selection clauses—subjecting oneself to the courts of the chosen forum.

Pursuant to *Hovde Acquisition* and the other similar cases cited above, the Court determines that to the extent Zero agreed to a contract including the Forum Selection Clause, it implicitly agreed to service by some means permitted by Delaware law. Zero has not suggested (and the Court cannot see) how service by one of the particular means set out in Section 3104(d) (here, via certified mail) would be inappropriate under these circumstances, or would be insufficient to provide Zero with "actual notice of the pendency of this action." Consequently, under these unique circumstances, the Court recommends denial of Zero's request that the Complaint be dismissed pursuant to Rule 12(b)(5).

## C.     Zero's Brief References to 28 U.S.C. § 1404(a)

In a few hasty references in its briefing materials, Zero suggests that if the Court finds that personal jurisdiction exists, it should nevertheless transfer venue to the Southern District of New York, pursuant to 28 U.S.C. § 1404(a). (D.I. 12 at 9; D.I. 18 at 4)  However, Zero has not: (1) made this request in a separate motion; (2) referenced the many specific and nuanced factors that a Court must consider in evaluating a transfer motion, first set out in *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995); (3) discussed the *Jumara* factors in any detail; or (4) provided much in the way of argument as to why transfer would otherwise be appropriate.

The Court declines to construe these brief, truncated references to Section 1404(a) as amounting to a motion that it must adjudicate. *See* D. Del. LR 7.1.2 (requiring that, unless otherwise ordered, all requests for relief must be presented to the Court by motion, and that a moving party must "clearly articulate within the body of the motion the relief requested and the grounds in support thereof"); *cf. Biovail Labs. Int'l SRL v. Cary Pharms. Inc.*, Civ. No. 09-605-JJF-LPS, 2010 WL 2132021, at *3 & n.3 (D. Del. May 26, 2010) (denying request to strike an expert report that was inserted in the last portion of an answering brief regarding another matter). If Zero seeks transfer pursuant to Section 1404(a), it should make that request in formal motion, in which it identifies and addresses the relevant *Jumara* factors by name and in detail, fully articulating the grounds on which the relief it seeks should be granted.[21] In the meantime, the Court will enter an Order directing the parties to provide it with a joint proposed Scheduling Order, will thereafter hold a scheduling conference pursuant to Federal Rule of Civil Procedure 16, and will enter a Scheduling Order thereafter.

## III. CONCLUSION

For the foregoing reasons, the Court recommends that Zero's motion be DENIED.[22]

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections

---

[21] The Court notes that if Zero did so, it would need to demonstrate that "the balance of convenience of the parties is strongly in favor of defendant" in order to prevail. *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970) (internal quotation marks and citation omitted); *see also Ross v. Institutional Longevity Assets LLC*, Civil Action No. 12-102-LPS-CJB, 2013 WL 5299171, at *5 & n.4 (D. Del. Sept. 20, 2013).

[22] In its answering brief, Hardwire requested that it be awarded its costs and attorney's fees for opposing the Motion. (D.I. 9 at 12) The Court declines Hardwire's request.

within ten (10) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 Fed. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: October 14, 2014

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE